here. You hear me? This honorable court for the second judicial district is now back in session. The Honorable Susan F. Hutchinson presiding. All right, please be seated. You're honest. Second case in the top this morning. All right, Mr. Minder, if you are ready, you may proceed. May it please the court. Your honor, your honors, excuse me. I was counsel in the trial for Joshua Schag. I do not believe that my client was allowed to adequately and fairly examine the victim based on the subpoena that we served on the victim prior to the commencement of the trial to testify in the case in chief. I believe as a result of the things that occurred in the trial court, my client's Sixth Amendment rights under the U.S. Constitution and the rights under the Illinois Constitution relative to Article I, Section 8 were violated with regard to the confrontation clause. Mr. Minder, before we get to some of the substance issues, we have some real serious procedural issues on your behalf. Supreme Court Rule 341 determines how issues should be presented and how a brief should be presented. And without identifying each and every one of them, we've got at least ten easy violations of those rules. And we could, if we so choose, just strike a brief, and that would resolve this. Did anybody look at Rule 341 when this case was being prepared for appeal? I did, your honor. Well, why didn't you follow it then? I thought I amended my, I did file an amended brief, which I thought was taking into account all the errors the counselor pointed out. Well, and Well, we're looking at the amended brief. We're talking about the amended brief. Yes. And there are not only problems with it, there are, I believe, outright misrepresentations of the record, which is a real problem. It's covered by any single Supreme Court rule. I don't think I made, I certainly didn't intentionally make any representations. Well, the biggest one is about the grandmother. We know what grandmother it was. You asked the question, and then you put in your brief, we don't know what grandmother it was. No, your honor. The reference to that was when the, first of all, the grandmother was never revealed until the victim testified in court. But our position was that it couldn't have been the grandmother in question because she had pre-deceased the time that the incident happened. We, my position was I thought that this was done as a result of trying to keep Heidi Slocum, who was the paternal, the maternal grandmother in the courtroom. Okay. That doesn't explain it. How about this one? I mean, there are several. Throughout your brief, your opening brief, you don't even mention that MP was called as a witness. You don't even mention it. You pretend in your brief as if MP, the court declined, who denied your opportunity to call MP as a witness. That was not the case. I don't recall saying that. I do. I recall. And then I withdraw it. Okay. There are several violations. But let's talk about, let's just talk about some substantive areas. Do you have any authority for the proposition that the trial court is prohibited from screening the areas of inquiry by way of an offer of proof? Do you have any cases? Do you have any law? I don't, Your Honor, and I forget it. Okay. That didn't answer the question. Would you agree that generally an offer of proof is adequate if the attorney spells out the anticipated testimony with particularity? Would you agree with that? You have to point out in particular what the testimony will be from the witness. I do, but I didn't know because I was – You didn't know that that was the law. No, no. I didn't know what the victim was going to say because my intent was to ask her open-ended questions. If you look at my cross-examination, I didn't go beyond the direct examination knowing that I had subpoenaed the witness in my case in chief. The entirety of the testimony included what you – at least what I could tell from the record. You had an extensive cross-examination of the victim. You even went into – when did she start menstruating? You went into everything. I read the record. Let me ask you this. Why would the State need to prove that the defendant had or wore a tongue ring when your question admitted that he did have a tongue ring? Because throughout the testimony, the victim alleged certain facts that were also inaccurate and not true. My question is about this question, and you accused the State of not calling other witnesses to confirm that the defendant had a tongue ring. When you put that in your question, do you know what a judicial admission is? I do, Your Honor. You asked that question, and you asked the victim, isn't it true that your father had a tongue ring before you were born? And then she answered yes in the affirmative. I did ask that question, and she gave that answer. Why would the State need to call any other witness when that question and the answer, which you called for, you know, called for that response, and you affirmed in your statement, isn't it true that it was true that he had a tongue ring? Why would the State be required to prove any or to establish any other facts or any other witness to testify? Because on the night of the alleged incident, there is no proof that he had the tongue ring in his tongue or was wearing it. Okay. You asked the question. I understand. And you argued in your brief that the State did not call any other witness who said that the defendant had a tongue ring. I did, and I also argued that there were people who testified who could have. But you misrepresent in the brief. You never even acknowledged in the brief that it was you who asked that question. You introduced that issue. Well, the record is clear. My point in the brief was that there's no substantiation that she had a tongue ring. And you also suggested that she must have had some prior sexual activity with somebody else having a tongue ring. What's that called? That's called victim shaming. Well, I understand. Yeah. The merit specialist, Ms. Kruger, testified on behalf of the State that there were certain sexual behaviors that could evolve but were not necessarily indicative of sexual abuse. Well, why didn't you call an expert as opposed to trying to shame her? I wasn't trying to shame her, Your Honor. Well, it sounds like you were. We don't have a report of proceedings for the court's ruling on your motion to have the victim examined by a psychologist or psychiatrist. There's no report of proceedings. Do you know what pouch is? I don't. Pouch versus O'Brien. Absent the record, we presume that the trial court's ruling was correct. Let me ask you another question. Throughout your opening brief and your response brief, you never talk about the propensity of the testimony of the defendant's sister. Understood? Why not? Because, in my opinion, one, the event that allegedly happened to Ms. Hunt, Heather, happened approximately 30 years prior. You can refer to it as HNT. I'm sorry. The incident happened approximately 30 years prior. When the paternal grandmother died in March of 2019, the victim and her mother, Ms. Slocum, went to Las Vegas to attend the funeral and stayed with HNT during that period of time. If you look at her testimony, and I did not cross-examine her because I didn't want to go beyond and open up any other doors. If you look at the testimony of HNT and the testimony of the victim, they're almost identical. Right. He did the same thing to her. And he apologized for it. And you also have the text messages in the record. That evidence is evidence of the defendant's behavior regarding MP, because he has a propensity to do what he did to MP. Well, as I argued in the trial court, I thought the incidents with regard to HNT was remote in light of the fact. But I understand your point. Donahoe makes it clear, doesn't it, and a more similar to the event that's under, that is on trial, the greater the similarity, the greater the weight. And in here, your client admitted it. He said to her, he apologized. And he wanted to know, if you're asked, what are you going to say? That's unrebutted. I understand. So how can we possibly reverse the trial court based on insufficiency of the evidence? I still think, in light of the fact of the subpoena, and in light of the fact of the trial court's admonitions when it said, I could not ask her about any of the suicide attempts. I could not ask her about the touching, the sexual abuse. I do think, I mean, I believe that there was other evidence that would have been gleaned from talking to the victim. You suggested that the victim may have been, you know, remembering things wrong, that somebody else had molested her while she was sleeping. And that's what you were trying to uncover with psychological examination? Or if you said that in your reply brief. I'm not trying to uncover, but I assume there was some other reason for the victim to have molested her. You say, you assume, in your brief, you say, defendant assumed. I believe that there was some other reason. That was your assumption, not the defendant's. Correct. I believe that there was some other reason why the victim took this stance against the defendant. So you're no longer arguing that she's a liar. Now you're arguing she's just mistaken. I'm going to make arguments of both. I'm saying I don't, well, given the facts of the case. In your reply brief, you say, Appellant believed that there was some alternative reason why MP accused the appellant. Appellant thought that MP had a relationship with someone that did not go well, and that this individual had a tongue-link or regarded MP's unknown sibling. What do you mean by that? The victim testified in terms of when allegedly the person came into the room, that it was dark and she couldn't see. Subsequently, several pages later in the transcript, the victim testified that she, and there's nine or ten references in the transcript that she never opened her eyes. Several pages later, the victim said as he was leaving, she opened her eyes and she saw it was her father. Initially, the victim testified that all she saw was a shadow, and there was corroborating testimony that there are no lights in the room, that the only thing on was moonlight. Her testimony, quote, it was dark and she couldn't see. Subsequently, the victim testified that, yes, she opened her eyes, and it was, in fact, she saw that it was her father. All these facts were before the trial court. They were. You're basically asking us to re-weigh the evidence, aren't you? I'm not. I'm asking you to – I'm not asking for a reversal. I'm asking that the defendant be allowed the opportunity, that the case be reversed and retried, that we be allowed to ask the victim open-ended questions, which was my intent in subpoenaing her. It wasn't – it wasn't – what's your offer of proof now? Well, if I were to say what's your offer of proof, what is your offer of proof? I – given the facts of the case and the victim testifying in terms of the bunk bed, that he couldn't stand on it. She didn't know if he could – she said he couldn't kneel on it, that it was really impossible for her – for him to do what she alleged, I believe, was impossible. She claimed that her pants and her underwear were around her ankles. This was a bunk bed. Those are all – those are all established, I hear, her testimony on direct and cross-examination. I'm talking – I'm asking what additional facts would you get out of the victim? And you just said you don't know. I think I would get a closer recitation of what actually occurred. I mean, her testimony was – her testimony from the get-go was ambiguous about him walking into the – someone walking into the room with shadow. She didn't know what the shadow was. And then when he left, she opened her eyes and it was her father. Well, did somebody switch places with him between the time she had her eyes opened and her eyes closed? I have no idea, Your Honor. Well, yes, you do. Well, I – I – Who else could have been in that room? Well, Your Honor, he came into the room twice, allegedly. Yeah. So it's not – it's not clear that she opened her eyes on the first time or the second time. In addition, between the first time and the second time, she never – she never bothered to call her mother because her mother – she thought her mother was sleeping. And yet if you look to the incident that happened on December 7, 2018, when the victim learned that the girl she was being yelled at for not talking to was, in fact, her sister, she contacted her mother, Ms. Slocum, and the girl wanted her mother to call the police to get her out of there. Ms. Slocum told the girl to call the police. The girl refused, so the mother called the police. They conjured up this story that said that my client was under the influence of alcohol and marijuana and the girl didn't feel safe. Officer Wittenhauer came to the house, did an inspection, and indicated that the – my client was neither under the influence of alcohol nor under the influence of any marijuana. But my client agreed to let the girl – let the girl go home with the maternal grandmother, who was Heidi Slocum. Officer Wittenhauer did note that there was an odor of cannabis in that house, but again, he did not – he said he was not under either alcohol or marijuana. Well, that doesn't mean he didn't use it. He just allegedly wasn't under the influence of it. Well, but the girl said she left – she wanted to leave because she didn't feel safe. This all started, as I said, on December 7th in 2018 when she was visiting for the weekend. So because of that incident, you're saying, and the police investigation of that incident, that everything she said at trial was basically not true? I'm not saying that. I'm saying she didn't have the propensity to tell the truth. All right, hold on. Justice Burkett? Yeah, just, you know, I have so many questions. One of the things that was troubling is that you acknowledged before the trial court, Judge Clement, that you subpoenaed – you issued a bunch of subpoenas to protect your client. I did. What did you mean by that? I meant everybody was sitting in the room and everybody was listening to the testimony. I was concerned in the case of – No, let me ask you this on follow-up. Do you have any authority for that proposition that ethically you can subpoena people, even though you don't know what their testimony is, that you have no intention of calling them, to prevent them from appearing in the courtroom, which is a public place, and the right to a public trial belongs to both the state and the defendant? I was only attempting to prohibit them from being in the courtroom when the victim was testifying because I was concerned that if I had to call someone, their testimony – Do you want me to answer my question? I do not. Do you have any authority for that? I do not. Why would you do it? Because I was concerned of what I indicated to you before, that the testimony from them would be consistent with what she said in the courtroom. As I indicated, no one – Well, if they're in the courtroom, the state can't call them either. So what are you talking about? But I believe – first of all, no one knew that the girl had – the victim never told even the state's attorney that the first person that she told was her grandmother. It wasn't ascertained to which grandmother it was at that point. Then it came out that it was her grandmother, the paternal grandmother, who – that doesn't make sense because she died before this all occurred. Okay. So the – That's not what you said. You said in court that you were doing this to protect and shield your client. Because I knew when the paternal grandmother had died, and the testimony was that the first person she told was her grandmother. It wasn't revealed at that point that it was her paternal grandmother who was dead. That makes no sense for her to say that she told her paternal grandmother who they knew was dead. And the incident hadn't allegedly occurred at that time. Depending upon what the date was. Correct, but the paternal grandmother died in March of 2019. The victim indicated that this happened in July and August of 2010. It was clearly before that. And as I indicated to you before with regard to your questions regarding HNT, the girl and her mother stayed with her aunt, HNT, during this entire time of the funeral that happened in Las Vegas. I mean, at some point it would be my position. It's unusual to me to see – I know Your Honor disagrees – but that the exact same circumstance that HNT testified was the same circumstance that the victim testified to. They're identical. Did you ask HNT whether or not she discussed any of this with the victim when she visited for the grandmother's funeral? I did not. I did not. In talking to my client, we decided – Well, this is all just huffery right now. Well, we decided not to cross-examine HNT. Okay. That's all I have. Okay. Justice Mullen? You don't really address the standard of review for Judge Clement's rulings about requiring you to explain why you were calling the victim in case in chief. Well, I thought I – The standard of review. I understand. I thought it would be de novo in light of the fact that what I was asking was the opportunity to ask the victim openly – It's pretty clearly abuse of discretion, isn't it? And I'm concerned your brief doesn't really address that. I see your point about being abuse of discretion. I wanted the opportunity to ask an open-ended question, which is to his point about limiting what I could talk about instead of not asking her about the touching, the abuse, or the suicide attempts. That was the whole case. When asking me to make an offer of proof involves suggesting something that we deem is going to be inadmissible so that it makes a record for the appellate court, I didn't know what she was going to say. I didn't have a set – I mean, I had areas that I wanted to go into with her on direct examination, but I have no control over what she's going to say. That was a risk that I discussed with my client and were willing to take in light of the fact of the circumstances of the case. Even if we can get by the problems with – the technical problems with the brief, you must have read, I hope, decisions that this Court has made and other courts have made that talk about offers of proof, and the fact that there isn't one gives us nothing to review. So you're worried that you were forced to make an offer of proof, and now you're saying that it was a violation of due process, I believe, in some way, or a constitutional due process. How are we supposed to review that if you wouldn't make it? Well, I did tell him the – he asked me – he then went through and said, tell me the areas you want to talk about. But that's not really an offer of proof. I agree, but that's what the Court accepted in terms of the years. I don't think – Well, you don't have to. I understand that. I don't think I could have made an offer of proof knowing I was asking her an open-ended question. Because you were guessing on just about everything. Is that why you couldn't make an offer of proof? No. No, Your Honor. I mean, I knew the areas that I wanted to talk about with regard to the touching and the alleged sexual abuse and the suicide attempts, okay? But I was – as soon as we started, I was precluded – that's the whole case. As soon as we started, I was precluded from even talking about any of those areas. You wouldn't be allowed to anyway, even if you called her. The judge had already said those are – it's irrelevant. There was no direct tie between the suicide attempts or any of the other features of a child who's been subject to abuse. There was no direct tie, and there was no testimony that her suicide attempts were related to the abuse. Well, as I said in the brief, in the opening statement, in the closing statement – I know. I know that it's not – You know this. The trial court is presumed to know and enforce the law and follow the law. So any statement that's made in an opening statement, closing argument, already followed, that's not supported by the evidence, could be disregarded. You agree with that? I do. Okay, so – But I also think I had – I think my client had a right to confront the victim. He did confront the victim. You did confront the victim. You cross-examined her. But I had also subpoenaed her prior to the commencement of the trial, and I wanted to call her in my case in chief. I repeated that several times throughout the trial. My client was denied the right, in my opinion, to confront her and ask her open-ended questions. The state objected because the state has an obligation to protect the victim from harassment and invasions of privacy. That's the Victim Witness Bill of Rights, and it's also the Victim Witness Statute under 725. And that's what the state did. And the trial court inquired and said, what do you intend to go into? And required an offer of proof, and you didn't make one. Well, I did. I think I made one to the state. Do you estimate with particularity what you're going to – what answers you expect to get from the victim? Well, the trial court came back and said, to your point, that he thought the evidence was going to be cumulative and he didn't want to do that. But anything I've asked her, if it was asked prior, would be subject to an objection by the state. Okay. Counsel, the time is up. You will have a chance for rebuttal if you choose after we hear from the state. Ms. Conley? May it please the Court, Counsel, my name is Claire Conley. I'm a staff attorney with the Illinois State's Attorney Appellate Prosecutor's Office. There's actually five issues that I – that we're going to be discussing today. And I think all five of them were addressed by this Court. So I'm going to start with the offer of proof in this case. As Your Honors recognize, it is entirely appropriate for the state to ask for an offer of proof in this case and for the trial court to grant that request. Now, the defendant seems to be changing his theory a little bit from a constitutional violation into whether or not the trial court actually erred in restricting some of the aspects of the testimony in this case. But what he raised in his brief is a constitutional challenge. And as Justice Burkett pointed out, there is always a concern when you have a victim of child sexual assault that there might be harassment. And that is, she signed a document saying she wanted to be protected by the Illinois Crime Victims Act. And that protection is that she be treated with fairness and respect for the dignity and privacy and to be free from harassment, intimidation, and abuse throughout the criminal justice system. And the trial court, pursuant to Illinois Supreme Court Rule 611, has the authority to control all aspects of a trial, including the interrogation of witnesses and presenting evidence so as to protect witnesses from harassment and undue embarrassment. And that's exactly what the state and the trial court did in this case to protect the victim. And the author of proof in this case, as you would point out, was insufficient as to why he needed to call her. He didn't give any details. As far as the Confrontation Clause and the Equal Protection Clause violation that he makes in his brief, the trial court's decision in this case did not violate the Confrontation Clause. The Confrontation Clause does not come into play during the testimony during the defendant's portion of the trial. A Confrontation Clause comes into play during the cross-examination of the prosecution witnesses. That's when the defendant has to have given adequate opportunity to ask questions from those witnesses. Now, counsel indicated that he cross-examined the victim only consistent with her direct testimony. And he did not want to go beyond that. Was there some other remedy that he could have engaged in at that time to get to some of the issues? Yes. And were any of those engaged? No. So obviously, you know, counsel on cross is limited by what was raised during the direct examination. And we recognize that. It was not improper for him to call her during the defense case. However, what he did was he said, well, I played it safe, basically. I didn't want to ask her any questions. But he could have, and as I point out, he could have asked her trial court prior to trial or at that point he could have asked the trial court, judge, I'd like to be able to get into this area, you know, how would you rule on it? Is that permissible? He didn't do any of those steps. He took it upon himself to just not ask any of those questions. And so the photographs that the defense introduced during the course of the trial, those were taken after the trial had started, correct?  And when did the state become aware of those photographs? I think the state, if I recall correctly, I don't think that they were taken in December, and then they found out about it once defense counsel tried to introduce them after the state had rested. That was during Sonia's testimony? Yeah, that was during Sonia's testimony, if I recall correctly. And I recall that the state objected to the introduction of those photographs. The trial court overruled the objection. Right, and allowed some of them in. But were they taken before or after MP testified? They were taken after she testified during direct examination. Because she testified during the first day, right? Correct, correct. She was the first witness that they called. So counsel didn't have the opportunity to cross-examine MP regarding the photographs. Correct, correct. Like I said, he could call her. That's fine. There's nothing wrong with him being able to call her. It's a matter of the offer of proof in this case as to his objection on constitutional grounds. So that's what he's raised on appeal. The other issue that he raises is equal protection. And this is clearly not an equal protection violation. When you talk about equal protection, it's defendants who are similarly situated are treated differently. We don't have similarly situated defendants. What we have is his complaint that he was required to do an offer of proof for the victim and not for other witnesses in this case. And the reason why there was no offer of proof is because the state didn't request an offer of proof for those other witnesses. So there was no equal protection violation in this case. Briefly, as far as, it was brought up briefly about the grandmother being allowed to remain in the courtroom. There are two issues, really, that you need to address when you have something like this. One is whether or not there was an abuse of discretion and whether or not there was any resulting prejudice. So as far as abuse of discretion in this case, this is what the court heard. The court heard from the state, we have no information from this witness that she has anything relevant to testify to. And then defense counsel got up there, and this is what defense counsel said. We're not sure. We have information that they may be useful to our case in chief. That's what his offer of proof was as far as calling the grandmother. So clearly the trial court, after hearing both sides, exercised appropriate discretion in allowing her to remain in the courtroom. And not for the entirety of the trial. She was allowed to remain during the state's case. And then subsequently, when the state brought it up again, defense counsel got up and said, I don't know what you're talking about. Of course she can remain in the courtroom. So she ended up being able to remain in the courtroom during the testimony of the victim during the defendant's case. And there was no resulting prejudice in this case because the grandmother wasn't called by the defense because she wasn't a relevant witness. She wasn't the one who the victim disclosed to. She disclosed it to the paternal grandmother, not the maternal grandmother in this case. So Heidi has had no relevant information in this case. As far as the request for a mental health examination in this case, clearly it's statutorily prohibited. There's no way that the trial court is allowed to grant such request. And as I can't remember, I believe it was Justice Burkett who pointed out, the record in this case is incomplete. And I pointed out my brief. We don't know what happened. That portion of the record was not included. So we don't know what the trial court ruled on. But what we do, we have the state's response. And we have the statute. And we know that that is not permitted. And as I pointed out in my brief, defendant's reasoning for why we need this evolved throughout the trial. In the pretrial motion, he argued that she needed to be evaluated due to her emotional instability. In the post-trial motion, he argued that the victim could be transferring a past relationship or someone who had a tongue ring, licked her vagina. And on appeal now, he says that she needed to be evaluated due to her suicide attempt. Those are ever evolving. And that goes into my invited error argument. But be it set that aside for now. But there was no basis for the trial court to bring a motion for a mental health examination in this case. Well, Kruger did testify, did she not, that she was aware of the diagnoses that had been made when MP was in treatment. That there was PTSD. But she didn't make that diagnosis. No, she did not diagnose. So it was self-reported by the victim that she had been diagnosed. Which there had been suicide attempts and that she had been diagnosed with PTSD. And bipolar. And Shannon Kruger said that that was, those are things that are connected, associated with victims, child victims of sexual assault. That was the basis for her testimony. There's also a lot of talk in the defendant's brief, and I just wanted to clarify some things about as far as the date of the offense. First of all, the state does not need to establish the date of the offense. And is not an essential element for a child sex assault case. There's a case law that clearly establishes that. And otherwise, the only other reason you would need to establish the date of the offense is if there's a statute of limitations question that was not involved in this case at all. So there's no reason for the defendant, there's no basis for the defendant's argument as far as the date. I'd also like to provide a timeline, and I'd like to point out to this court that during the closing argument, the prosecutor provided a timeline in this case. And so what happened was, in the indictment, there's a range of dates. It starts with August 2nd of 2017, and that is when the victim turned 12. Goes to August 31st of 2019. She testified that this assault occurred when she was 12. So that means that the assault occurred between August 2nd, 2017, and August 2nd, 2018. So that's when this occurred. She also provided details as to, which I'll get to later, about the circumstances. One day, she's at her dad's house, they were swimming, all of those things. So she provides that timeline. Then, the next relevant event is in December of 2018, which means she's 13, is when she's over at her father's house. And that's the last date of the visitation. And she testified that she became upset at that time because of the, she had observed the defendant smoking marijuana and drinking. And so she called her mother, mother called the police. That was the date of the last visitation. Now, there's talk about the grandmother's death, I should say, the paternal grandmother's death. And she died, there's testimony, she died in March of 2019. That would have been after the time that she was 12, it would have been significantly after that. Then the girlfriend who testified on the defendant's behalf, she moved into the house in April of 2019, which was after the time that the victim had testified, or had testified that she was 12 years old and it occurred during that time period. And then there's a time about the concert that she attended with the defendant. She said that was in August of 2019. And she testified that that was the last time that she saw the defendant. And she had not seen the defendant after that. So that clears up the dinks in this case. What about Jason's testimony about that he, whenever he was there, MP was always there, and there was never a time when she was there that he wasn't there? Well, obviously the court didn't believe him. This is what the court said in the findings. There is nothing that was presented by the defense that for me undermines the direct testimony of the victim in this case. Clearly the trial court is the finder of that. And this court obviously, you know, has to be the evidence in the light most favorable to the prosecution. Believed every word of the victim's testimony in this case. She provided clear and detailed testimony about what happened to her on that date. She knew that they went swimming in the backyard. She knew she took a shower. They had dinner. They were supposed to watch America's Funniest Home Videos with the defendant. And that she and the defendant were the only ones in the house at that time. And that her brother was at a sleepover at that time. You also have evidence... He acknowledged when he was interviewed by the Children's Center investigators, correct? He acknowledged that there were nights when he slept over at a friend's house. Yes, and he said that there were times that he would sleep over at a friend's house when he stayed with his father. There's also her testimony about the fact that after she took a shower and they were watching television, that she was sore from cheerleading practice. That the defendant offered to give her a massage and that during that massage, that his hand moved down and was over her bra, but underneath her clothing and he touched the side of her breast. That upset her so much that she went to bed. And she stared up in the ceiling. And that's when the defendant chose to come into her room and sexually assault her for the first time. And yes, she said she kept her eyes closed, but she also testified that she heard the defendant talking. May I finish? You may finish your thoughts. Talking at that time, and she recognized his voice. There's also further testimony that he then ended up coming back into the room and sexually assaulting her for a second time. There is overwhelming evidence by the victim, which was corroborated by her statement to Shannon Krueger as medical treatment purposes and the defendant's sister that corroborates her testimony, that there was overwhelming evidence in this case and the people ask that you affirm the defendant's conviction in this case. Thank you, counsel. Mr. Minor, if you have any rebuttal, you may proceed. I have a few points, Your Honor. One, with regard to what counsel said in terms of the victim said the incident occurred in 2017, would have occurred in 2017 to 2018, the victim testified the incident happened in the summer of 2019. With regard to Ms. Krueger testifying with regard to the victim that told her, Ms. Krueger talked to the victim four years later. With regard to the situation regarding the grandmother, the State didn't even know that the victim had said that she had told her grandmother. No one knew who the grandmother was, which grandmother it was at the time that that came up. Again, my position obviously was I thought it was the one who has been coming with her all the time. Obviously, it was not that particular grandmother. There's nothing in the Confrontation Clause that says that everything has to be done on cross-examination. I have the victim made the State at some point acknowledge that the ---- All right. Let's go back to that. Let's look at the context of that particular constitutional issue. It's the defendant's right to confront witnesses against him. Most are him or her. That occurs during their presentation by the State. If they don't testify for the State, there is no case. So how ---- why couldn't you engage in this confrontation at the time you cross-examined her? There were motions in limine that could be filed. There was a specific request to have a specific testimony done, well, of course you had no jury here, but just privately with the judge and counsel. There were other things that could have been engaged. Why did you not do those things? Because I wanted to ask the victim open-ended questions and hear what her responses were, which could have led to other information that would have been beneficial to my client. Well, open-ended questions are not necessarily for direct examination. They're for cross-examination. No, understood. I mean, that's why I subpoenaed the witness. After I saw the witness disclosures and what the State was going to put on, I believed that there was a lot of evidence that needed to be brought to the attention of the court that wasn't going to be talked about. So from the discovery that you were tendered, you had no idea what the State was going to present in that case when you walked in the door for trial. Is that what you're saying? Other than what's in the State's attorney's notes. Well, why wouldn't that be what they're going to present? But I wanted the opportunity to ask the victim an open-ended question. So you make a motion in limine before anybody says anything, or you make it at the time that the witness has testified because you need to have answers to certain questions and you want to pursue it further. You never ask that at the time. I'm sorry. That's why I filed a subpoena, and all along I've been indicating to the trial court that I had a subpoena in file, and I was going to call her as a witness in my case in chief. For example, what question would you have asked MP, and what would she have said? I don't know what her answer would be, but for example, one of my questions would be, I don't know how she would have, her testimony was that he had this tongue ring on, and she said, and I quote, that's exactly how I knew it was him. I don't know how someone would know how a tongue ring felt on their vagina unless they had experienced it before they had some other understanding. And if you tried to ask that question, it would have been objected to, and the trial court would have sustained the objection because you cannot inquire into other sexual activities of a crime victim. That's the law. Understood. As I said, Ms. Kruger testified that victims such as this deal with other sexual propensities that are not necessarily related to the abuse. But you never pursued that angle in order to get to the point that you wanted to get to. I never asked her any questions on cross because I was more concerned about the judge not giving me latitude and denying me the question. Because you never asked. Okay. Go ahead. With regard to the date of the event in terms of when did it happen, there are witnesses that the state could have called, such as the hospital roommate in the record who the girl testified she told when she was at the hospital about when the event occurred. They could have called the name. Jason said he was there the entire time. He never left when his sister was there. And allegedly the girl, the victim testified he went to a neighbor's house for a birthday party. We look at the evidence that was presented, not what was not presented. You now understand the Collins standard of review. I understand. So they look at what was presented, not hypotheticals. The victim testified that he went to the neighbor's house for a birthday party. Why does the state require to call some other witness? To get some propensity in terms of when the date was. I understand that they don't have to prove. May I finish? I understand that they don't have to prove when the date was. But there was a lot of evidence regarding when the date was. Was there a request for a bill of particulars in this case? Not to my knowledge. Well, you would have issued it. Right. So you didn't request a bill. I did not. Okay. That's all I have.  Justice Miller? All right. Counsel, you may summarize because your time is up. Very quickly, as I said, I had no idea what the victim was going to say in terms of an open-ended question. I think the judge limiting our inquiry and telling me that we could not discuss the touching, the sexual abuse, or the suicide attempts because the judge kept saying you had adequate time. But as I indicated to you, I only covered what was covered on direct. I was not willing to risk the judge limiting my examination because it was beyond the scope. Our intent was never to embarrass the victim. That was his daughter. He had no intent of embarrassing his daughter. We just wanted to get to the truth. We referred originally to the pictures one and two, which the judge admitted those for purposes of demonstrative purposes. They were just pictures of the bed. The girl testified. He wasn't standing. She didn't know if he was kneeling. There was no way he could have done what she said she did, what he did, in that period of time. It's just impossible. Thank you. All right. Thank you, Counsel, for your arguments. This matter will be taken under advisement, and we will decide the issues accordingly. We will stand in a brief recess to prepare for our next oral argument.